1           UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3  ------------------------------x

4  UNITED STATES OF AMERICA      :  DOCKET NUMBER 07CR10158

5           versus               :  UNITED STATES COURTHOUSE

6  RAKEEM WALLER                  :  BOSTON, MASSACHUSETTS

7  ------------------------------x

8
                    AUGUST 12, 2008
9

10                    2:00 p.m.

11
              TRANSCRIPT OF SENTENCING HEARING
12

13  BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
                UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19              OFFICIAL COURT REPORTER

20      DIANE M. MOLAS, RPR, DE & MA CSRs, AND NJ CCR
                OFFICIAL COURT REPORTER
21  UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS
                ONE COURTHOUSE WAY
22      THIRD FLOOR - COURTROOM 1 - SUITE 3200
                BOSTON, MA 02210
23          TELEPHONE: (267) 977-2909
            E-MAIL:  Dmolas1@aol.com
24

         PROCEEDINGS REPORTED USING MACHINE STENOGRAPHY.
25  TRANSCRIPT PRODUCED EMPLOYING COMPUTER-AIDED TECHNOLOGY.

1   APPEARANCES:

2       ATTORNEY FOR THE UNITED STATES OF AMERICA:

3           MICHAEL J. SULLIVAN, ESQUIRE
            UNITED STATES ATTORNEY
4           UNITED STATES DEPARTMENT OF JUSTICE
            UNITED STATES ATTORNEY'S OFFICE
5           DISTRICT OF MASSACHUSETTS
            ONE COURTHOUSE WAY
6           SUITE 9200
            BOSTON, MA 02210
7           TELEPHONE: (617) 748-3800; DIRECT DIAL: 617-748-3207
            E-MAIL:  John.wortmann@usdoj.gov

8
            BY:  JOHN WORTMANN, ESQUIRE
9                **ASSISTANT UNITED STATES ATTORNEY**

10

11      ATTORNEY FOR THE DEFENDANT, RAKEEM WALLER:

12          LAW OFFICES OF STEPHEN J. WEYMOUTH

13          BY:  STEPHEN J. WEYMOUTH, ESQUIRE
                 COURT-APPOINTED COUNSEL
                 65A ATLANTIC AVENUE
14               BOSTON, MA 02110
                 TELEPHONE:  617-573-9598
15               E-MAIL:  Sweymouth@sweymouthlaw.com
                 FAX:  617-367-1407

16

17      **ALSO PRESENT:  BRETT WINGARD**
                 U. S. PROBATION OFFICER

18

19

20

21

22

23

24

25

1    <u>**OFFICIAL COURT REPORTER:**</u>

2          **DIANE M. MOLAS, RPR, DE & MA CSRs, and NJ CCR**
            **OFFICIAL COURT REPORTER**
3          **UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS**
            **ONE COURTHOUSE WAY**
4          **THIRD FLOOR - COURTROOM 1 - SUITE 3200**
            **BOSTON, MA 02210**
5          **TELEPHONE: (267) 977-2909**
            **E-MAIL:  Dmolas1@aol.com**

6

7

8

9

10                                  -    -    -

11

12

13

14                      P R O C E E D I N G S

15                      **SENTENCING HEARING**

16          THE DEPUTY CLERK:  All rise.

17          This Honorable Court is now in session.

18          You may be seated.

19          Calling the case, Criminal Action 07-10158, the

20   <u>United States versus Rakeem Waller</u>.

21          THE COURT:  Well, I guess the first order of

22   business is this Motion to Extend Time to File Oppositions to

23   the PSR.

24          Is anybody paying attention?

25                                  -    -    -

1          (No response.)

2               -  -  -

3          THE COURT:  I mean, I've had a series of

4   continuances requested here, starting back on May 31.

5          The original objections were due on May 28; then,

6   they were due on July 22, and, then, another continuance is

7   sought; first, by the Government, who apparently was unaware

8   that he had a vacation, and, then, by Defense counsel

9   effectively saying I'm not free until sometime in September.

10          At some point, we have to bring this to a

11   conclusion, but I don't understand, on both sides, the neglect

12   of the obligations to attend to the Presentence Report, and

13   the question for me is whether to say:  Well, you had a

14   chance, and leave it at that.

15          MR. WEYMOUTH:  Your Honor, Steve Weymouth for the

16   defendant.  I take responsibility from the defense side, I was

17   paying attention, but I got overloaded with work.  I've been

18   out on two different occasions to meet with Mr. Waller to go

19   over the Presentence Report, spoke to Mr. Wingard, but, quite

20   frankly, Judge, I just really did drop the ball.

21          It wasn't as if I just came up with the issues.

22          I had been thinking them through, trying to figure

23   out what to do about them, but just lost sight of the date to

24   start producing those objections to either written form of a

25   letter, or in motion form, but it didn't prevent me from

1    speaking with and meeting with Mr. Waller and

2    Mr. Heinrich (phonetic) on a regular basis about how we were

3    going to proceed, but I did drop the ball.

4              THE COURT:  That makes two of you.

5              MR. WEYMOUTH:  I didn't mean to throw him under the

6    bus.

7              THE COURT:  There is another participant in this

8    sentencing.

9              MR. WEYMOUTH:  If you're referring to me, I was

10   just a little overwhelmed this summer with work, that I did

11   lose sight of the deadlines and the dates.

12             THE COURT:  Okay.

13             Well, you're here for Bankwell's (phonetic) ghost,

14   I guess.

15             MR. WORTMANN:  Your Honor, I first saw this file at

16   4:30 on Friday, however, I appeared before Your Honor

17   representing the United States, and therefore I represent the

18   United States Attorney's Office, and all I can say,

19   Your Honor, is I understand your unhappiness.  I looked at the

20   file, I took the file home over the weekend, I looked at it,

21   there were certain things that I thought should be done, and I

22   did them as quickly as I could.  I know that's not

23   satisfactory from your standpoint, but there's nothing else I

24   can say.

25             THE COURT:  I'm getting a feeling, to be perfectly

1    candid, and this is simply an instance of it, that there's

2    become a kind of practice of inattention to the schedule

3    that's established, on the part of both the U. S. Attorney's

4    Office in a number of instances and Defense counsel, on the

5    assumption that they can work it out at some point.

6         Now, the Probation Office is getting heat from The

7    Court to be timely, and, frankly, timely is, we're talking

8    about three months to get Presentence Reports up.

9         That seems to me to be a very long time, in any

10   event, quite apart from this new, relaxed attitude toward the

11   deadlines, and, of course, it puts The Court in an awkward

12   position, because, then, The Court ends up doing what

13   Probation does, of sorting through things, and you can't, I

14   don't think fairly, penalize either party.  It is more salient

15   for the defendant but equal -- equally important for the

16   Government, that they get a fair shot to address the

17   underlying issues, so I guess I can express my profound

18   disappointment and march on, so I'm going to allow the belated

19   objections, reflected in substance in Mr. Weymouth's letter of

20   August 11, and the Government's memorandum of August 11.

21        Now, as I see it and you'll correct me if I'm

22   wrong, but going through this set of objections, we're really

23   talking about only objections, as to the question of crime of

24   violence, under -- with respect to two particular prior

25   convictions.

1          The Government, I take it, is not disputing that

2    Paragraph 44, which is the Class B, is not a predicate here.

3          MR. WORTMANN:  I agree, Your Honor.  It certainly

4    accounts for criminal history purposes, but not for career

5    offender purposes.

6          THE COURT:  So let me just be sure I'm taking these

7    things out of the calculus here.

8                         (Pause.)

9          THE COURT:  And I guess it never was in, but I take

10   it back.  In Paragraph 44 -- Paragraph 54, actually strike the

11   fifth line, in reference to Paragraph 44.

12         Is that right?

13         MR. WORTMANN:  Yes, Your Honor.

14         THE COURT:  Okay; and I take it that there isn't

15   the dispute that Paragraph 38 is a predicate here; is that

16   right?

17         MR. WEYMOUTH:  That's correct, Your Honor.

18         THE COURT:  So now we turn to 39, and, here, it

19   seems to me the Government has the better of the argument.

20   The language of the statute for resisting arrest does almost

21   verbatim track the language of the criminal offender

22   provisions or career offender provisions for a crime of

23   violence, and I think I'm not allowed to look beyond it here.

24         I don't see any -- see no grounds for that.

25         Is there anything that you can say that could

1    arguably cause me to change my mind about that?

2            MR. WEYMOUTH:  I have no authority or support, but

3    I just, as I argued in the letter, by reviewing the summary of

4    the police report that Mr. Wingard made on Page -- in

5    Paragraph 42, it sets forth the basic elements of the events

6    as they happened on that particular day.

7            And I understand, and I agree with Your Honor, as

8    far as the Government's argument is concerned, the crime of

9    violence definition is very, very similar to the definition

10   set forth in, I think it's, 268 32B, the Massachusetts

11   Resisting Arrest Statute, but sort of the fact, that you know,

12   on a day-to-day basis, what goes on in the District Courts and

13   the Commonwealth of Massachusetts, yes, there was a conviction

14   of Mr. Waller of resisting arrest.

15           But, if you look at the facts as set forth in the

16   police report, there is no indication here of either the

17   attempt or the threat or the use of some sort of physical

18   force, either against a civilian, who may have been assisting

19   in the arrest or, more importantly, a police officer who was

20   attempting to effectuate an arrest.

21           It sounds as if perhaps either Mr. Waller placed

22   his arms or hands in a position that the officer in the

23   execution of the default warrant could place the cuffs on and

24   either the arms and hands were pulled back or perhaps Mr.

25   Waller never presented the arms and then at some point

1     indicates in the report that Mr. Waller fled, and, at that

2     point, as far as the facts as described in the police report,

3     and I don't know exactly what it was Mr. Waller admitted to on

4     a factual recitation by the District Attorney's Office before

5     a judge, it does not appear under those facts as if Mr. Waller

6     in this incident either used physical force on the

7     police officer, threatened to use physical force on that

8     police officer, or even attempted to use physical force.

9            Now, a situation where perhaps Mr. Waller pushed

10     the officer's hands away as the officer came down with the

11     handcuffs that's not listed in the police report, and I

12     suggest most respectfully, Judge, I'm not trying to get

13     underneath the guilty plea, obviously there was an admission

14     of sufficient facts a guilty finding was made at some point in

15     that particular court, but, perhaps, the actions that

16     Mr. Waller engaged in on that particular day did not meet

17     truly and correctly all of the elements as set forth in the

18     resisting arrest statute and perhaps there were other reasons

19     for resolving the case.

20            But, at least, based on the summary of the police

21     report in the pre-sentence report, it appears as if the

22     elements of threatening or using or attempting physical force

23     on another seem to be lacking in this particular situation,

24     and that's what I'd ask The Court to consider.

25            THE COURT:  Well, I understand that it is, to some

1   degree, the unusual mirror imagine of those occasions in which

2   the Government attempts to make a particular transaction, a

3   crime of violence, by averting to the police report, and the

4   categorical approach which has been adopted by the courts

5   seems to me to preclude that, not merely for the Government,

6   but for the defendant.

7           If I were even to consider the police report, it's

8   a little unclear.  Nevertheless, the nature of the

9   confrontation, which led to the charges, while at the outer

10  limits, as recited in the Presentence Report, that the outer

11  limits of what arguably is resisting arrest have enough to

12  them to suggest that this is -- was a series of events which

13  could fairly be prosecuted as resisting arrest and as a crime

14  of violence.

15          Of course, we only have a police report.

16          We don't even have what the recitation was, but the

17  courts have tried to avoid having ex post facto trials of

18  convictions when we're dealing with categorical statutes and

19  here the categorical statute, I think, brings the defendant

20  in, so I reject that objection, and, now, I move on to

21  Paragraph 42.

22          I'm not sure exactly what the objection is to 42

23  being included here.

24          MR. WORTMANN:  Your Honor, in view of your ruling

25  on the resisting arrest, I'll withdraw that objection.

1          THE COURT:   I'm not even sure it's your objection.

2          I think it's Mister -- well, it is your objection,

3  in the sense that it's been -- it has not been included in the

4  Presentence Report, although I think the communications that

5  Mr. Weymouth was having with Probation indicated that

6  Probation was starting to lean in the direction of including

7  it.

8          My own view is that now that it's been raised, I

9  want to be sure that I find all the predicates --

10          MR. WORTMANN:  Okay.

11          THE COURT:   -- here, and I understand the humane

12  impulse is not to pile on, but I think my view is I want to be

13  sure that there's been a proper calculation, irrespective of

14  whether or not the Government doesn't want to press it, in

15  light of an earlier determination that I made, with respect to

16  Paragraph 39, but the short of it is:  How can I not find

17  assault with a dangerous weapon to be a crime of violence?

18          MR. WEYMOUTH:  Initially, Judge, if I can read this

19  properly, he was charged with assault and battery, dangerous

20  weapon and at some point, Count 1 was amended.  That was the

21  count where there was a guilty finding made.  It was assault,

22  dangerous weapon.  Again, I'm just asking and arguing for a

23  summary of the police report that appears here, the same

24  argument made in Rule 39, and I certainly understand

25  The Court's leaning toward that direction, but that would

1   basically be the fact that it was reduced to assault,

2   dangerous weapon and the fact the police report summary as

3   included in the Presentence Report indicates a bit of an

4   argument with the mother of the child or previous girlfriend,

5   but I would suggest it does not rise to the level of a crime

6   of violence, Your Honor.

7           THE COURT:  Well, I'm not even sure about that even

8   if I read it.  The victim suffered an injury to her left elbow

9   and bruising and swelling, which suggests that what was

10  involved here was violent activity on the part of the

11  defendant, but, in any event, the state of the record is that

12  he, apparently, pled to assault and battery with a dangerous

13  weapon and --

14          MR. WEYMOUTH:  I think it was assault with a

15  dangerous weapon.

16          THE COURT:  Assault and battery with a dangerous

17  weapon and down to assault with a dangerous weapon, but,

18  assault with a dangerous weapon is clearly use of means which

19  creates substantial risk of causing bodily injury, to put

20  someone in fear of serious physical injury being received, so

21  I think it comes within the scope of the Career Criminal crime

22  of violence, so are there any other objections to the

23  Presentence Report itself here?

24          MR. WEYMOUTH:  There are none, Your Honor.

25          THE COURT:  Alright; so --

1            MR. WORTMANN:  No, Your Honor.

2            THE COURT:  So what we're dealing with, just so

3  we're clear about the numbers, is a Criminal History Category,

4  because of the crime of violence calculations that I made of

5  six, a total Offense Level . . .

6            MR. WEYMOUTH:  Your Honor, I believe that the

7  Offense Level was 29.

8            THE COURT:  Yes.

9            And, with respect to Paragraph 54, include the

10 reference to Paragraph 42 there, so I am essentially

11 substituting for Paragraph 44 Paragraph 42, in Paragraph 54,

12 but a total Offense Level of 29, a Criminal History Category

13 of 6, and the Guidelines under circumstances like this are 151

14 months to 188 months in prison, three years of supervised

15 release.

16            There is a fine of $15,000 to $3,000,000 and

17 special assessments of $300, so we're dealing with the same

18 set of numbers.

19            MR. WEYMOUTH:  We are, Your Honor.

20            THE COURT:  Okay.

21            So Mr. Wortmann, what is the Government's

22 recommendation here?

23            There is a reference, and I think this is the point

24 to get to, to get some discussions.

25            MR. WORTMANN:  Well, Your Honor, first, let me

1    state the obvious, in that the record that we're looking at is

2    harsh.

3              THE COURT:  Mm-hmm.

4              MR. WORTMANN:  Mr. Waller has thirteen convictions,

5    ten of which he committed while he was either under probation

6    or pretrial release.  We've got four distribution convictions,

7    four possession convictions, two crimes of violence and three

8    others.

9              Since the age of fifteen, I count about an eight or

10   nine month period in which he has not been under some form of

11   criminal justice supervision.  It's just exactly what Congress

12   had in mind.

13             Offsetting that in this case is what I understand

14   conversations took place at or about the time of the plea, in

15   which Mr. Heinrich (phonetic) advised Mr. Weymouth that he

16   didn't think that Mr. Waller was a Career Offender, and I

17   thought about that a lot, and it's easy to say --

18             THE COURT:  Is that -- I'm not rejecting, but is it

19   that he was not a platonic Career Offender, in the sense of

20   the pure concept of Career Offender or that he wasn't a Career

21   Offender, in light of his actual record?

22             MR. WORTMANN:  I think the latter, Your Honor, and

23   I think Mr. Heinrich (phonetic) indicated to Mr. Weymouth that

24   he, again, as I take it, the plea was relatively last-minute,

25   was a Criminal History Category 5, that would have resulted in

1   the guideline range of something in the range of 70 to 87

2   months, so you look at that and you say:  So what?

3               THE COURT:  Can I address it --

4               MR. WORTMANN:  Yes.

5               THE COURT:  -- just so I understand the state of

6   play?

7               There is no suggestion here that there was anything

8   in the plea colloquy or any agreement between the parties that

9   wasn't developed in the plea colloquy that would create a

10  reliance interest on the part of Mr. Waller.

11              MR. WORTMANN:  And, Your Honor, I don't think

12  anything that was said that was a promissory commitment or

13  something that would have risen to the level of requiring an

14  affirmative response had Your Honor, given what I understand

15  and note to be your standard colloquy under Rule 11, but there

16  is another issue here, which is that we're not supposed to

17  make mistakes like that, and, had we not made it, would

18  Mr. Waller have changed his conduct?

19              Quite frankly, I don't think so.  We have three

20  sales on video.  It would have been crazy for him to go to

21  trial, and if he had been told he was a career offender, would

22  he have made the same decision.

23              Only he knows that, but, quite frankly, as I sit

24  here, and I looked at the evidence and read the PSR, I think,

25  at the end of the day, it's in his interest.

1          But, still, Your Honor, it happened and it

2    shouldn't happen, and we're not supposed to make mistakes that

3    are careless.

4          It would be one thing to tell somebody they're a

5    five, as oppose to a six, but, quite frankly, I looked at this

6    PSR and very quickly concluded that I believed Mr. Waller to

7    be a Career Offender, and I think that that's something just

8    because we're the Government that Your Honor should take into

9    account.

10          I think you should take into account the, while it

11    would be inappropriate to look at the seriousness of the

12    offenses --

13          THE COURT:  Let me just understand what you're

14    saying about taking into account that the criminal goes free

15    earlier because the assistant has stumbled?

16          MR. WORTMANN:  Yes, in this particular situation,

17    and done something that quite frankly should not have

18    happened, and, you know, are there other things in this

19    record?

20          You know, you can look at the -- here, we can look

21    at the underlying nature of the predicates and talk about

22    those things.  Here, we can look at the size of the drugs,

23    and, Your Honor, the recommendation the Government is making

24    is ninety-six months' incarceration, five years of supervised

25    the release, which ends up being the high end of the

1   non-career offender guideline.

2           I'm going to ask Your Honor to go up from three

3   years to five years, because I think that is ultimately going

4   to inure to Mr. Waller's benefit, and I think probably what we

5   should be talking about the most and, quite frankly, not

6   knowing the case, I have the least to offer, is what we can do

7   to try to prevent Mr. Waller from spending the rest of his

8   life in jail, because, if he does this again, he will.

9           I've talked a little bit to Mr. Wingard that

10  Mr. Waller has plans to go to Las Vegas, which, given his

11  track record in the City of Boston and the his track record in

12  the City of New Bedford have got to be an improvement, but

13  where he goes is important, and trying to just keep him away

14  from the New Bedford, Fall River area, and, quite frankly, the

15  City of Boston just makes a lot of sense, because he cannot

16  function in that environment, without getting into trouble

17  again, and again, and again.

18           I see in the PSR that Mr. Waller has interest in

19  getting his G. E. D., interest in getting vocational training,

20  and I applaud those things, and I think those are things that

21  you should require of him.

22           Were Mr. Waller to stay in the Boston area, I would

23  recommend that he goes into the Drug Court, because I think

24  he's exactly the kind of person --

25           THE COURT:   When you said Drug Court, you mean the

1    care of --

2              MR. WORTMANN:  Yes, or, hopefully, by the time he

3    gets out, we'll have something analogous dealing with at-risk

4    people who have been gang involved, which might even be more

5    appropriate.

6              You know, the other things that I think about, and,

7    again, I apologize to Your Honor, because I just don't know

8    him well enough to, you know, whether or not, with that kind

9    of reduction, a review of his conditions when he gets out

10   might really be the thing to be appropriate.

11             If he's going to be in the area, you know,

12   geographic restrictions might make sense, a curfew might make

13   sense.

14             If he's going back to Fall River and he has no

15   place else to go, well then, he shouldn't be out past

16   six o'clock, he should be required to go out and get

17   vocational training, because I'm confident that everybody in

18   this room wants one thing, and that is never to see Mr. Waller

19   again, and those are the things that can make a difference,

20   and those are the things I'd ask The Court to think about.

21             The problem here is we don't know enough about his

22   future at the end of whatever the term of incarceration you

23   would impose, so that would be generally the Government

24   recommendation, and I hope you understand the reasons.

25             THE COURT:  Alright.

1          Mr. Weymouth?

2          MR. WEYMOUTH:  Thank you, Your Honor.

3          I can't argue with you or with the Government about

4    Mr. Waller's record.  We've all seen it.  We've all reviewed

5    it.

6          We've spent a lot of time in your chambers looking

7    at it.  I know John, Mr. Wortmann, has, and I've looked at it

8    for quite some time.

9          There is no way to justify it.  There is no way to

10   explain it.

11         But, as Mr. Wortmann points out, perhaps what we

12   really need to look at, and what we can look at, and what we

13   hold in our hands is the future of Mr. Waller.

14         The Court may remember, from looking at the PSR,

15   that, in December of 2006, Mr. Waller was convicted in the

16   New Bedford Superior Court and was sentenced to a period of

17   incarceration at the House of Corrections.

18         Little did he know that the Federal Government had

19   been involved in the investigation of him and some others in

20   Southeastern Massachusetts, and he learned that in

21   May of 2007, about the time he made his initial appearance

22   before the magistrate.

23         I don't know Mr. Waller.  I was not locked up with

24   him.  I don't know what he's been thinking, since May of 2007,

25   but I suggest to you:  This is the first time, Judge,

1    Your Honor, that he's been in the federal system.

2              When he and I go over the Sentencing Guidelines and

3    look at the numbers, I think for the first time he really

4    recognizes how serious the sanctions are that the Federal

5    Court, yourself, has the power to impose on someone like

6    Mr. Waller, who has spent eighteen or nineteen years of his

7    life violating the law, for over a period of time from when he

8    was a juvenile to today, he's thirty-three, almost thirty-four

9    years old.  Mr. Waller counted the number of those

10   convictions.  Mr. Waller engaged in all of those activities.

11   There's no question about it.

12             He was born in Tennessee, moved to Boston when he

13   was four or five, lots of brothers and sisters, chaos and

14   discord in his home.

15             He didn't have the benefit of a two parent

16   household, or a one parent household, where there was a

17   regular income or regular employment that shows examples to

18   the children and the family.

19             Went to school periodically; was at the Woodrow

20   Wilson in Dorchester, Massachusetts for a period of time; left

21   that school; finished the eighth grade; went to high school

22   and dropped out in the eleventh grade.

23             And as he was sitting in the United States District

24   Court, Judge, he understands, I think, as to why the benefit

25   of one getting a good education in this society and how it can

1    help people move forward and pull themselves up.

2           And unfortunately for Mr. Waller, that example

3    wasn't in his family.

4           So getting an education wasn't as important in his

5    young life as it should have been, and, as I think he's

6    starting to realize now and has been realizing for the past

7    year about what an education can do for him, because I do

8    know, from speaking with him, and I hope he's being honest

9    with me, that spending the last almost four years locked up, I

10   mean, two-and-a-half years, I'm sorry, Your Honor, both on the

11   state and on this case, have made him reassess his case.

12          He has several children, as you can tell from the

13   PSR.

14          He has a fourteen or fifteen-year-old daughter who

15   lives in Roslindale, with whom he has had written

16   correspondence.

17          He has an eight-year-old daughter who lives in

18   Las Vegas, Nevada, which is what Mr. Wortmann was referring

19   to.

20          He maintains a relationship through letters and

21   cards, and the like, with that child, as well.

22          He wants to be a responsible father for the two

23   children who are still under the age of eighteen and for whom

24   he can provide guidance and support and an education about

25   what not to do, as far as living one's young life is

1    concerned.

2          While he was, while Mr. Waller, was locked up at

3    the, he spent time at the Bristol County House of Corrections

4    in Dartmouth, he became friendly with a gentleman that he

5    calls, Mr. Waller calls, his mentor.  I think he's part-time

6    correctional officer, but he's a part-time minister who

7    ministers to and mentors some of the men who are being held at

8    the Bristol County House of Corrections.  I didn't think I

9    needed to subpoena him, but he and I had been in contact on a

10   regular basis.  He knows about today's hearing, and he was

11   supposed to be here to testify, briefly, for Your Honor, about

12   what he saw in Mr. Waller that would make him want to come

13   here and testify about Mr. Waller, because he sees lots of

14   people on a regular basis.

15         I have Certificates of Recognition for Mr. Waller;

16   participated in many programs at the facility; he passed all

17   those programs; and, basically, he got involved in these

18   programs because of Officer Dias (phonetic) and the strong

19   mentoring and guidance that he has provided to Mr. Waller.

20         As Mr. Dias (phonetic) told me on the telephone,

21   it's very rare when he ever considered testifying or

22   supporting an inmate who is about to be sentenced, but he saw

23   something in Mr. Waller that made him think that, perhaps, he

24   had learned his lesson finally, once and for all, and that

25   there was good in him that could be translated into good for

1   others, as well as productive member of society.

2           As Mr. Wortmann correctly points out, no matter

3   what sentence you give him, at the time of his release, if he,

4   Mr. Waller, were ever to pick up another case again,

5   especially a case in federal court, he would spend an

6   incredibly long time in jail because of the way he has lived

7   his life in the past, and now is the opportunity for

8   Mr. Waller to stand up and take responsibility for what he

9   did, which he did before you, under Rule 11, and to recognize

10  that he needs to be punished for what he has done.

11          He recognizes that he will be punished probably

12  more severely because of his background, but he also

13  recognizes that there's a sense of fairness and a sense of

14  mercy to him, that emanates from this Court, that will take

15  into consideration all of his background, both good and bad,

16  and the future that possibly could hold something very good

17  and very wonderful for Mr. Waller.

18          It's asking a lot, Your Honor.  I understand it's

19  asking a lot.

20          The instant offense that we appear before

21  Your Honor on involves three separate sales of relatively

22  small amounts of cocaine base, in this case, crack cocaine.

23  We know what that's done to communities, and Mr. Waller has

24  participated in those kinds of activities, and I think I can

25  tell The Court, at least this is what he's told me, that he

1    wishes he had been able, and wishes he had made different

2    decisions throughout his entire life, so he will have a period

3    of time to get his G. E. D.

4            He will have a period of time, I hope, to continue

5    his education, maybe take some college courses.  He has been

6    working on his resume, as I have asked him to do, and he has

7    been helped by Mr. Dias (phonetic) trying to update his

8    resume.

9            He is a young man who is interested in working.

10           If he can find a skill that would allow him to work

11   at a job that pays him a fair wage, a wage with benefits for

12   his family, that would give him an opportunity to have

13   something else to rely on, other than running the streets and

14   being an outlaw, which is how Mr. Waller has lived his life in

15   the past.

16           I wish there were lots of good things I could say

17   as far as the things in the past.

18           Unfortunately, as you can tell from his record,

19   there aren't, but we do know that at some point in the future,

20   this young man will move forward and he can be a big help to

21   American society, and he can be a productive member of society

22   and, just, he needs some guidance to make it happen, and he

23   needs some hope to make it happen.

24           Most respectfully, Judge, I would ask you to

25   sentence him to -- and I know it's well below the Level 29,

1   Criminal History Category 6 -- but basically the very low end

2   of 21, Criminal History Category 6, which is the level that

3   Mr. Waller would have found himself, had there not been

4   Career Offender time, and ask you to sentence him to

5   seventy-two months in prison.

6            I'd also, Judge, ask, I don't know if I should make

7   it now, but I think that Mr. Waller would benefit from the

8   500-hour Residential Drug Treatment Program at the Bureau of

9   Prisons.

10            THE COURT:  I just want to pull this out.

11                      (Pause.)

12            THE COURT:  Alright.  Mr. Waller, I'll hear from

13   you, if there's something you'd like to say right now.

14            THE DEFENDANT:  Yes, sir.

15            Excuse me if I'm a little choked up.

16                      (Pause.)

17            THE DEFENDANT:  I would like to take this time to

18   apologize to The Honorable Mr. Woodlock and the rest of the

19   courts for my wrongfully doings in the United States, and I do

20   accept all responsibilities for these acts before me, and I do

21   understand that I have a very bad record, but still I'd like

22   for The Court to have mercy.

23                      (Pause.)

24            THE DEFENDANT:  When I was a young child, my life

25   wasn't all that great, but some of my school years was pretty

1    good.

2            Until I reached my teen years, that's when I

3    started getting in trouble, fighting with gangs, because I

4    didn't want to be down with the -- I would sometimes find

5    myself getting jumped at the school by the -- so I would ask

6    my mother -- so I would tell my mother that I didn't like the

7    schools that I was in, so I would please beg her to switch me

8    to a better school.

9            I felt very ashamed for lying to her, but I feared

10   the most that, if I told her, she would call the police and

11   the gangs would find out about it, and I feared then that they

12   would try to do something to my family, so I learned how to

13   sell drugs, which is not a good thing, just to buy a gun to

14   protect myself, and, as I got older, it got worse for me.

15           I would sometimes find myself selling drugs, just

16   to get out, and that's when my life fell apart,

17   December 22, 2006, I was sentenced to two-and-a-half

18   suspended -- two years committed, the balance suspended, two

19   years' probation, and, before I left The Court, I asked the

20   judge if he could enroll me in a drug program, and, at the

21   beginning of this program, I wasn't doing so good, because I

22   was still feeling down about myself, until I met Mr. Dias

23   (phonetic).

24           He would come and talk to me every chance he got,

25   to see how I was doing, and, then, he asked me if I would be

1    interested with being in the re-entry program, and I asked

2    him:  What is a re-entry program, and he said it is a program

3    to help you get your life back on track, and, from then on, I

4    felt like I was needed for something, and something good was

5    gonna come out of my life.

6              Even though the federal case came down on me, I

7    still didn't give up what I was doing for myself.

8              I even got involved in the Drug Readiness Program,

9    so I could feel good about completing something in my life,

10   and, until this very day, I still feel good about it, because

11   I know I can make it, if I put my mind to it, and, with that,

12   I'm begging you, Your Honor, to please give me another chance

13   at life, so I can prove to you and the courts that I can

14   change and be a better person, and I also want to prove it to

15   my kids and my mother.  She's sick, and all I want to do is be

16   there for her and my wife, and all I needed was a little bit

17   of help, and I felt that help, thanks to Mr. Dias (phonetic),

18   and I also want to thank the courts for taking this time to

19   listen to what I had to say from my heart, and I'm truly

20   sorry --

21             God bless.

22             THE COURT:  Thank you, Mr. Waller.

23             Well, the larger problem, I think, is this, that,

24   for a variety of reasons, people get themselves involved in

25   the state courts in serial kinds of offenses where the

1  sentences are comparatively light and then they find

2  themselves in the federal court at a time in which they've

3  developed a kind of criminal record that causes them to face

4  enhanced punishment.

5          I have considered this record not merely in terms

6  of the frequency of the problems that Mr. Waller's

7  encountering with the law, but, also, in terms of the

8  significance of the offenses, seriousness of the offenses,

9  over time and I've considered, as well, the seriousness of the

10  offense charged here.

11          I don't mean to, in any way, diminish the

12  seriousness of the offense charged here or the things that

13  have happened over time, but they do not, it seems to me,

14  aggravate the kind of Draconian guideline that is generated by

15  a total Offense Level of 29 to a Criminal History Category

16  of 6.

17          The short of it is:  I'm not satisfied that the

18  guideline that is generated in this area is a reasonable

19  sentence for a man in his early thirties, with a long list of

20  problems, but the beginnings, I think, of a recognition that

21  he's got to put his life together, so, applying the principals

22  of Section 3553, look, first, at the seriousness of the

23  offense.

24          Well, it was a serious offense, not the most

25  serious in this range, but a serious offense.  I have to be

1  concerned about not providing a sentence that would promote

2  disrespect for the law, but I don't think that it's necessary

3  to go to the range of thirteen years in prison to make that

4  point.

5          I consider the question of general deterrence:

6  What would someone in Mr. Waller's shoes, who's got himself

7  involved in committing these kinds of offenses, think about a

8  sentence that was lower than what the Guideline generates?

9          And I'm not sure there's a general understanding

10  about the likelihood that a sentence like this would be

11  imposed on someone, but I certainly don't think that 151

12  months, which is the bottom of the applicable guideline, is

13  the place to put it, to ensure general deterrence.

14          As to specific deterrence, I really do think that

15  Mr. Waller getting his G. E. D., getting some trades, getting

16  on with his life, at a time when circumstances are not so

17  turbulent and the setting is not so turbulent, means that he

18  will not be coming into This Court, but it requires some

19  significant sentence to get to that point.

20          This is a case in which, I think, so-called

21  penological considerations have some value; that is, he's

22  provided with a structured setting from which he can start to

23  work on the basics that he needs to get on with his life, and

24  he seems to recognize that are in his best interest and

25  something to be desired, so the short of it is that I'm going

1    to cut the sentence from the guideline by more than half, I'll

2    put it at eighty-four months in prison.

3              I will impose a period of supervised release of

4    five years.  I think the Government's correct that it would be

5    a benefit to Mr. Waller to have a longer period under

6    supervision, once he gets out of prison, particularly since,

7    while it's been serial, he, nevertheless has been subject to

8    the Criminal Justice System for a long period of time, and the

9    re-entry issues, I think, are going to be significant for him,

10   but, more than that, I want to have the Probation Office

11   provide support for them.

12             Parole/Probation Office does provide support for

13   offenders who work hard at it, and it's for the benefit of the

14   offenders.

15             I won't impose a fine.  I don't think that

16   Mr. Waller is in a position to pay a fine.

17             What fine would be extracted would be taken from

18   his several family obligations or potential for paying the

19   obligations.  I must impose a $300 special assessment, and I

20   will do so.

21             With respect to the question of imprisonment, I

22   will direct -- or, I shouldn't say direct -- I will make a

23   recommendation that the defendant participate in the Bureau of

24   Prisons 500 hour residential drug abuse program.  He's got his

25   own problem with drugs, quite apart from his involvement on

1    the supply side.

2           I will make a recommendation that he pursue and be

3    afforded opportunities to pursue his G. E. D. program.  It's a

4    foundation, Mr. Waller, you know that.

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  I'm going to make a recommendation, as

7    well, that he participate in job training of various kinds, to

8    develop the kinds of skills that will be helpful to him when

9    he gets out into society, so that he's got something that he

10   can offer an employer beyond the ability to do general labor,

11   but things that require a little bit of training and there is

12   time for that training while he's in prison.

13          During the period of supervised release, as I said,

14   it will be five years, he is obligated to report to

15   Probation Office in the district to which he's released within

16   72 hours, and, in connection with release, I am going to

17   provide as a special condition that he not live in or visit

18   the area of Fall River and New Bedford.

19          That may require tailoring, if you come out and

20   think you want to go back into that community, but that

21   community's death to you, Mr. Waller.  It's just a way of

22   getting you in trouble.

23          If you go back into there, it's going to be

24   problems for you.

25          I'm sorry, go ahead.

1              THE DEFENDANT:  Yes, my wife lived there.  She had

2      moved to a better area in New Bedford, so I wouldn't get in

3      any trouble.

4              THE COURT:  Mm-hmm.

5              THE DEFENDANT:  And the Probation Officer had set

6      up a meeting to go see the place, but I guess because of my

7      work schedule that they were unable to meet up.

8              THE COURT:  Well, I'll tell you what I'm thinking

9      about this and that is that I want to make that a general

10     prohibition.  Things will change, as you can imagine, in the

11     next seven years, less good time, and they may change, in

12     terms of where her location is, where she's living, that sort

13     of thing, and I'm open to the idea of Probation telling me

14     that there is a way for you to live in the Fall River or New

15     Bedford area that doesn't put you at risk.  But, I'm concerned

16     that you're at risk, and so to frame the issue, and you can

17     talk to Probation and Probation will come back to me.

18              I'm going to say that you shouldn't be in Fall

19     River and New Bedford, and if they think that there's a way

20     for you to do it, they'll work it out, if you have to do it.

21     But, I want to emphasize something for you, something that I'm

22     sure you know, that you shouldn't be anywhere near the people

23     that you've been dealing with before.

24              Now, with respect to Boston, I'm not going to make

25     that specific prohibition in the terms and conditions of your

1   release, but that's what I'm thinking about, and why I'm going

2   to include it as a special condition.

3          Do you understand?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Now, with respect to the general

6   conditions of supervised release, they are all intended to be

7   in place, but, in addition, I want to emphasize that the

8   defendant shall not commit another federal, state, or local

9   crime.  He shall not illegally possess or use a controlled

10  substance.  He must refrain from all unlawful use of

11  controlled substances, and one of the ways we're going to be

12  able to monitor that is that the defendant will be subject to

13  a drug test within fifteen days of his release from prison and

14  at least a 104 drug tests, or as many as 104 drug tests, as

15  directed by the Probation Office during the period of

16  supervised release, to make sure he hasn't relapsed into drug

17  use.

18         That form of testing is meant to dovetail with the

19  substance abuse program that I will direct the

20  Probation Office to undertake for Mr. Waller, and, to the

21  degree that he's capable of contributing or he has access to

22  third party payment, he'll be required to contribute to the

23  cost of those services.

24         But, in any event, we want those services to be in

25  place, to permit Mr. Waller to continue to deal with the drug

1  problem that he's had, particularly when you get out.

2          The defendant must submit to a DNA sample.

3          He is prohibited from possessing a firearm or other

4  dangerous weapon, and he shall pay the special assessment of

5  $300, no later than the completion of his supervised release,

6  although I expect that there'd be some sort of financial

7  responsibility program within the prison system that will,

8  perhaps, over this time period, satisfy that go special

9  assessment.

10          Now, are there any other terms or conditions that

11  the parties want to mention?

12          MR. WORTMANN:  No, Your Honor. Thank you.

13          MR. WEYMOUTH:  No.

14          THE COURT:  Mr. Waller, you understand you have the

15  right of appeal.  You'll discuss with Mr. Weymouth whether

16  that makes sense under these circumstances.

17          You also understand that the sentence here could

18  have been very severe.  The Government, as far as I'm

19  concerned, they acted honorably in recognizing there were some

20  discussions that may have -- led you to have hopes, of some

21  sort, that they wouldn't be so high.  But that's only part of

22  my consideration.  My basic consideration are the ones that

23  I've outlined under Section 3553.

24          The idea of getting a sentence that is no more

25  severe than is necessary to serve all of those several

1    purposes, and it seemed to me that the sentence that's less

2    than half of what the Guideline would be does that, but it's a

3    severe sentence.

4              Nobody's making any mistake.

5              You'll understand that it's not any light sentence,

6    but it's meant to bring home to you and give you the

7    opportunity to develop your own skills.

8              Yet, you haven't been a productive member of

9    society now, and you want to be a productive member of

10   society, and, if you aren't, you'll be back for a very long

11   time in prison.

12             I don't think you're pointed in that direction.

13             I think you are pointed in precisely the opposite

14   direction, the direction of trying to do something for

15   yourself and your family, and all of this is set up to try and

16   make it possible for you to do that.

17             And, for the period of five years of supervised

18   release, you'll find that the probation officers, that they

19   don't want to hassle you.

20             They are there to try to find ways to make it

21   possible for you to get on with your life in a meaningful sort

22   of way.

23             So, if you accept the sentence in that fashion,

24   recognize the sentence in that fashion, without compromising

25   your legal rights, I think you're on the right track to making

1    it possible for you not to face something like this ever

2    again.

3              Alright?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  Okay.

6              So, if there's nothing further, then, we'll be in

7    recess.

8              MR. WEYMOUTH:  May I make one final comment?

9              THE COURT:  Yes.

10             MR. WEYMOUTH:  When he, Mr. Waller, made his first

11   appearance before the magistrate on May 31, he was serving a

12   sentence.

13             Is there's any possibility that he could get credit

14   for that period of time?

15             He was discharged from the state sentence on

16   March 13, 2008, so, since March 13, 2008, this case has

17   been --

18             THE COURT:  I'm going to give him time from

19   March 13, 2008.

20             I don't think that I can give him time for the

21   previous sentence, and we'll recognize it as Time Served, but

22   there will be Time Served recognized from March 13, 2008.

23             MR. WEYMOUTH:  Okay.

24             THE COURT:  Alright.

25             Thank you very much.

1                           -   -   -

2              (The proceedings were concluded.)

3                           -   -   -

1                        I N D E X

2

3                                              PAGE

Hearing                                         3

4

5

6

7                      -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X
(CONTINUED)


E X H I B I T S


(NO EXHIBITS WERE MARKED.)


- - -

# C E R T I F I C A T I O N

I, DIANE M. MOLAS, an Official Court Reporter in the United States District Court - District of Massachusetts, a Registered Professional Reporter (RPR), a Certified Shorthand Reporter (CSR) in the States of Delaware and Massachusetts, a Certified Court Reporter (CCR) in the State of New Jersey, and a Notary Public in the Commonwealth of Pennsylvania, do hereby certify that the foregoing is a true and accurate transcript of the proceedings reported by me, on August 12, 2008, and that I am neither counsel, nor kin, to any party or participant in said action, nor am I interested in the outcome thereof.

/s/Diane M. Molas_____ _____
Diane M. Molas, RPR, DE & MA CSRs, and NJ CCR
        DE Certification Number 208-RPR
        MA Certification Number 149208
     NJ Certification Number 30XI00228400
     8/9/09

- - -

*(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the DIRECT CONTROL AND/OR SUPERVISION of the Certifying Court Reporter herself.  THE COURT REPORTER'S CERTIFICATION NEVER APPEARS AS A PHOTOCOPIED SIGNATURE.)*

- - -